# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The property located at 14207 Point Judith Street,<br>Fontana, California 92336, and the person of Matthew<br>Ryan Johnston | )<br>)<br>)<br>)<br>)<br>)    Case No.  2:17-MJ-2625 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 and A-2.

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| See Attachment B | |

The application is based on these facts:

See affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Jeremy M. O'Hara, ICE Senior Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles,  California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

I.    **PREMISES TO BE SEARCHED**

The property to be searched is:

1.    The property located at 14207 Point Judith Street, Fontana, California 92336 ("SUBJECT PREMISES").  The SUBJECT PREMISES is a two story, single family residence.  The exterior of the residence is tan with dark brown trim and the building is covered in a stucco-type surfacing with white garage doors.  The roof appears to be reddish-brown clay tile.  The front door entrance faces north and is west of a three car garage.  There is a flagpole in the front and bearing a United States flag. The numerical address "14207" is printed on the curb in front of the residence and on a sign near the entrance.

a.    The SUBJECT PREMISES to be searched include (a) all rooms, porches, containers, and safes in the SUBJECT PREMISES; and (b) the driveway, and any garages, carports, storage spaces, or other outbuildings on the SUBJECT PREMISES; (c) any vehicles parked at the SUBJECT PREMISES owned by or under the control of Matthew Ryan Johnston; and (d) any digital devices found at the SUBJECT PREMISES.

**Instrumentality Protocol**

**ATTACHMENT A-2**

**I.    PERSON TO BE SEARCHED**

1.    The person of Matthew Ryan Johnston, date of birth August 9, 1991, black hair, brown eyes, with California Driver's License Number E1457593.

2.    The search of the aforementioned person shall include:

a.    Any and all clothing and personal belongings, including weapons, digital devices, backpacks, wallets, briefcases, and bags that are within Johnston's immediate vicinity and control at the location where the search warrant is executed.

**Instrumentality Protocol**

## ATTACHMENT B

**I.    ITEMS TO BE SEIZED**

1.    The fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 912, 18 U.S.C. § 701, 18 U.S.C. § 506(a)(3), and 18 U.S.C. § 499, and 26 U.S.C. § 5861(d) ("SUBJECT OFFENSES"), namely:

a.    Records, documents, notes, papers, cards, genuine, counterfeit, or unauthorized, reflecting identity, title, or appearance of a government employee, including but not limited to credentials, badges, patches, and clothing bearing insignia of a government or law enforcement agency or department;

b.    Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized identification documents or the insignia of a federal agency or law enforcement;

c.    Contents of any calendar or date book stored on any of the digital devices;

d.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

e.    Data, records, documents, notes, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring information related to any federal agency or law enforcement agency, at which JOHNSTON is not employed;

f.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

g.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications or other text or written communications sent to or received from any digital device;

i.    Audio recordings, pictures, video recordings, or still captured images of firearms, federal agency or law enforcement related items, individuals bearing federal agency or law enforcement related items, actual, counterfeit, or unauthorized identification documents, or relating to the collection or transfer of the proceeds of the above-described offenses;

j.    Firearms accessories, parts, and parts kits, including upper receivers, barrels, trigger mechanisms, stocks,

ii

**Instrumentality Protocol**

holsters magnets, bullet button locks, sights, forward pistol grips, silencers, suppressors, auto-seres, and bi/tripods.

k.    Firearms, including pistols, revolvers, shotguns, rifles, semi-automatic assault weapons, destructive devices, short-barreled shotguns, short-barreled rifles, machineguns, and silencers; photographs of firearms, other than those legally registered to Johnston or other residents of the SUBJECT PREMISES;

l.    Records, documents, programs, applications or materials relating to the ownership, occupancy, or use of any vehicle used to facilitate the SUBJECT OFFENSES and/or articles of personal property tending to establish the identity of person(s) in possession or control of any vehicle used to facilitate the SUBJECT OFFENSES, including vehicle insurance documents, vehicle registration documents, department of motor vehicle documents, maintenance receipts, parking tickets, vehicle code violation tickets, purchase, lease, or rental agreements, loan payment receipts, keys, letters, mail, personal belongings, and personal photographs;

m.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with sources of supply or customers of firearms or ammunition, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, emails, text messages, photographs, and videos (including items stored on digital devices);

iii

**Instrumentality Protocol**

n. Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

o. Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts; and

p. Any digital device used to facilitate the above-listed violations (and forensic copies thereof).

q. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

r. With respect to any digital device used to facilitate the above-listed violations:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

iv

**Instrumentality Protocol**

v.    evidence of the times the device was used;

vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony

Instrumentality Protocol

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

vi

<b>Instrumentality Protocol</b>

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

vii

**Instrumentality Protocol**

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an

Instrumentality Protocol

application for such an order is pending). Otherwise, the government must return the device.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

Instrumentality Protocol

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of any person, who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

Instrumentality Protocol

## AFFIDAVIT

I, Jeremy M. O'Hara, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a search warrant to search 14207 Point Judith Street, Fontana, California (the "SUBJECT PREMISES"),[1] and the person of Matthew Ryan Johnston ("JOHNSTON"), which is described more fully in Attachment A-1 and the person of JOHNSTON described more fully in Attachment A-2. for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 912 (False Impersonation of a Federal Officer or Employee); 18 U.S.C. § 701 (Possession of Insignia of Federal Agency or Department by an Unauthorized Person); 18 U.S.C. § 506(a)(3) (Possession of False Insignia of Federal Agency or Department); and 18 U.S.C. § 499 (Manufacture of Counterfeit United States Official Pass or Permit); and 26 U.S.C. § 5861(d) (Possession of Unregistered Firearm) as described in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

2.    Any facts or circumstances that are cited in this affidavit are familiar to me through my direct participation in this investigation, discussions with other law enforcement personnel involved in this investigation, or my review of investigative reports generated by other law enforcement personnel.  This affidavit is made for the sole purpose of

---

[1] JOHNSTON is believed to live at the SUBJECT PREMISES, along with additional family members.

1

**Instrumentality Protocol**

demonstrating probable cause for the issuance of the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF ICE SENIOR SPECIAL AGENT JEREMY M. O'HARA</u>

3.    I am a Senior Special Agent ("SSA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Office of Professional Responsibility ("OPR"), where I investigate matters concerning employee misconduct, bribery involving ICE employees, individuals who impersonate ICE employees, and individuals who commit violations that injure or discredit the reputation of ICE.  I am assigned to the Office of the Special Agent in Charge, West ("SAC WEST") located in Long Beach, California.

4.    I have been assigned to SAC WEST since May 31, 2016, and have participated, as both the case agent and a supporting agent, in a variety of different types of investigations, such as: employee misconduct, sexual battery, stolen government property, and impersonation of a federal employee.

5.    Previously, I served as a Homeland Security Investigations ("HSI") Special Agent ("SA"), beginning in December 2008.  As a SA, I investigated state and federal violations with different law enforcement groups, such as: the Narcotics Smuggling group, the Border Enforcement Security Task

2

**Instrumentality Protocol**

Force ("BEST"), the SAC Intelligence Collections Program, the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force ("LA IMPACT").

6.    To become a SA, I received approximately three months of basic training, followed by approximately three months of advanced training at FLETC.  After completing my training, I was initially assigned to the HSI Narcotics Smuggling Group, Los Angeles.  After arriving at HSI, I successfully completed a two-year, on-the-job training program.  I have been involved in about five investigations related to violations of federal firearms statutes.  I have also spoken to many law enforcement agents regarding their experience in investigating firearms offenses.  I have also been involved in numerous investigations in which I have reviewed evidence from digital devices.  I have also been an adjunct instructor at the Federal Law Enforcement Training Center ("FLETC").

7.    While assigned to HSI, I have participated in numerous criminal investigations as either the case agent or an investigating agent.  In particular, I have participated in various aspects of criminal investigations, including: wiretapping telephones, telephone records analysis, electronic surveillance, physical surveillance, search warrants, and arrests.  I have also interviewed defendants, sources of information, confidential informants, and witnesses who had personal knowledge regarding criminal organizations and methodology.

3

**Instrumentality Protocol**

8.     Prior to my career with DHS, I served as a state certified police officer in Michigan.  In 2001, I attended approximately four months of basic training at the Washtenaw Community College Police Academy in Ann Arbor, Michigan.  I successfully completed the training requirements for certification by the Michigan Commission on Law Enforcement Standards.  As a police officer, I received advanced training in a variety of disciplines and was involved in more than 100 arrests.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.     On or about October 11, 2017, JOHNSTON represented to the San Bernardino County Sheriff's Department ("SBSD") that he is an ICE employee.  However, law enforcement confirmed that JOHNSTON was not in fact an ICE employee.  JOHNSTON has texted photographs of himself purporting to be an ICE agent and has represented or social media that he is an ICE agent.  I also saw a photograph of a possible rifle that is not registered to him, a possible silencer, and a possible grenade or flair launcher in the back of what appeared to be his rented Dodge Challenger. Official public records show that JOHNSTON listed the SUBJECT PREMISES as his residence, and law enforcement obtained recent mail sent to JOHNSTON at that address.  I believe that JOHNSTON resides at the SUBJECT PREMISES.

Instrumentality Protocol

## IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of investigative reports and my discussions with other law enforcement officers working on this investigation, I learned the following information:

### A.  **JOHNSTON Tells SBSD that he is an ICE Employee**

11.  On October 11, 2017, SBSD stopped a white 2017 Audi bearing California License Plate Number 7XHG108 for having flashing red and blue police lights activated.  At the time the car was stopped, there were two women in the car.  The driver was B.J. and the passenger was A.T.  Detective ("Det.") Jon Mabry told B.J. that he pulled them over because they had red and blue police lights activated.  B.J. then stated the car belonged to her boyfriend, JOHNSTON, that JOHNSTON worked for Homeland Security, and that she was trying to plug her phone into the charger and was not aware of any lights.  She then provided Det. Mabry the vehicle registration and JOHNSTON's phone number of (909) 695-5317 ("JOHNSTON's Phone").  After further investigation, law enforcement discovered that JOHNSTON rented this car.

12.  Det. Mabry then had B.J. call JOHNSTON's Phone.  When a man answered, she gave the phone to Det. Mabry.  Det. Mabry identified himself as a deputy sheriff with the SBSD and told the man about the incident.  The man identified himself as JOHNSTON, and stated that he does work for Homeland Security and forgot to take the lights off the dash of the vehicle.  JOHNSTON then asked Det. Mabry to tell B.J. to take the lights down and

5

Instrumentality Protocol

put them under the seat.  At that time, Det. Mabry allowed B.J.
and A.T. to leave without further incident.

**B.    Discovery that JOHNSTON was Impersonating an ICE
        Special Agent**

13.    On October 12, 2017, SBSD Det. Mabry contacted the ICE
San Bernardino office regarding the incident that took place on
October 11, 2017, between SBSD officers and JOHNSTON, and
JOHNSTON's claim of being an ICE employee.  ICE Intelligence
Research Specialist ("IRS") Jessica Howard responded to the
request, conducted a record search through ICE indices, and did
not find records indicating that JOHNSTON was an ICE or HSI
employee.

**C.    JOHNSTON Indicated that he Works For the Department of
        Homeland Security on Social Media**

14.    On or about October 12, 2017, IRS Howard conducted a
social media search and learned that JOHNSTON had two
www.facebook.com account ("Matthew Johnston Facebook Accounts")
under the names "Matt Johnston" and Matthew Johnston."  SA
Albert Rabadi compared the personal information associated with
JOHNSTON's California Department of Motor Vehicles driver's
license with what was disclosed on the Matthew Johnston Facebook
Accounts and SA Rabadi believes that the Matthew Johnston
Facebook Accounts are JOHNSTON's.  A review of the account
showed images of JOHNSTON.  SA Rabadi has compared a photograph
of JOHNSTON with a California Department of Motor Vehicles
picture from his adolescence with the pictures on the Matthew
Johnston Facebook Accounts and SA Rabadi believes that the

6

**Instrumentality Protocol**

photographs in the Matthew Johnston Facebook Accounts depict
JOHNSTON.

15.  One of these images was of JOHNSTON standing in front
of a Redlands police car.  Another image on one of the Matthew
Johnston Facebook Accounts was of JOHNSTON standing by a doorway
wearing a dark blue polo shirt with insignia patches with
"[illegible] security officer" on his right shoulder, body
armor, tactical khakis, and tactical dropdown holster, similar
to that of an ICE agent.

16.  Another image on one of the Matthew Johnston Facebook
Accounts was of a white Dodge Challenger bearing California
License Plate number 7ZEL045, with what appears to be red and
blue police lights on the dash.  On October 18, 2017, I
conducted a record search for the vehicle and learned that the
vehicle belonged to EAN Holdings LLC, a car rental company.

17.  A further review of one of the Matthew Johnston
Facebook Accounts revealed that JOHNSTON had posted his current
employment as "Department of Homeland Security" and stated that
he worked in "Fugitive Apprehension".

**D.   Records Check Showing that JOHNSTON is Not an ICE
Employee**

18.  On October 12, 2017, IRS Howard conducted a records
check of the ICE global email system and determined that nobody
by the name Matthew Ryan Johnston has a currently registered
email with ICE.

**Instrumentality Protocol**

19.  On October 18, 2017, I checked in the internal affairs case management system, and found no record of Matthew Ryan Johnston in the system.

20.  On October 18, 2017, the Special Agent In Charge, Jeffrey Gilgallon, checked an ICE employee directory, and did not find anybody employed by ICE with the name of Matthew Ryan Johnston.

**E.   Follow-up Interview of JOHNSTON's Girlfriend**

21.  On October 12, 2017, Det. Mabry contacted B.J. at her house to return her registration.  B.J. appeared disturbed by the incident.  During the interview, B.J. stated she met JOHNSTON approximately two months ago.  B.J. had questioned JOHNSTON about his employment and he told her that he worked for Homeland Security but was fired after his divorce.  According to B.J., JOHNSTON said he became a security guard and was recently re-hired by Homeland Security.  B.J. showed Det. Mabry a photograph she said JOHNSTON had sent her from JOHNSTON's Phone of a handgun, a pair of black handcuffs, and a Homeland Security ID Badge with JOHNSTON's picture, and a gold ICE belt badge.

22.  According to B.J., over the past two months, JOHNSTON has given B.J. between $1,500-$2,000 every week for no reason.  B.J. said that JOHNSTON would always "pull out a large wad of cash" and give it to B.J. whenever she needed money.  B.J. showed Det. Mabry a picture she said JOHNSTON sent her from JOHNSTON's Phone of several $100 bills.  The picture was

Instrumentality Protocol

accompanied by a text message saying that the cash was "misplaced" by a suspect while they were serving warrants.

23.  While Det. Mabry was talking with B.J., she said JOHNSTON had left his identification card in her car.  She then provided it to Det. Mabry.  B.J. also produced an image of A.T. wearing JOHNSTON's tactical vest with "Federal Agent" patches while she stood at the rear of a white Dodge Challenger, with its trunk open and what appeared to be an AR-15 style rifle visible inside.  I have seen this picture.  Based on my training and experience, I believe the picture shows an AR-15 style rifle with what appears to be a silencer and a 40mm grenade launcher, or a 37mm flair launcher affixed to it.

24.  On October 20, 2017, SA Rabadi conducted a database check for firearms check of JOHNSTON.  The firearms check revealed that JOHNSTON has handguns and shotguns registered to him, but no rifles registered to him.

25.  Based on my training and experience and knowledge of firearms investigations, I understand JOHNSTON may have an unregistered rifle, and may possibly be in possession of a silencer or grenade launcher in violation of 26 U.S.C. § 5861.[2]

**F.    Identification of the SUBJECT PREMISES**

26.  California DMV records show that JOHNSTON listed the SUBJECT PREMISES as his address on his California Driver's License.  Using additional department resources, a further

---

[2] Johnston has a guard license which would permit him to own certain guns.  I cannot determine from the photograph whether the rifle is a firearm, and if possible grenade launcher is in fact a flair launcher.

Instrumentality Protocol

records search revealed JOHNSTON had a least five firearms registered to him with the address listed as the SUBJECT PREMISES.

27.  Law enforcement conducted an additional record search through the Citizen Law Enforcement Analysis and Reporting system and revealed that JOHNSTON's listed address was the SUBJECT PREMISES and his listed telephone numbers included JOHNSTON's Phone and three other telephone numbers: (909) 904-0957, (909) 355-5839, and (909) 904-6421.

28.  A record check of the California Bureau of Security and Investigative Services records revealed that JOHNSTON had two current exposed firearm permits with the address listed as the SUBJECT PREMISES.

29.  On October 12, 2017, SA Rabadi conducted a record query for JOHNSTON through the Consolidated Lead Evaluation and Reporting database and found that JOHNSTON had a listed address of the SUBJECT PREMISES.

30.  On October 18 and October 19, 2017, other law enforcement agents and I conducted surveillance at the SUBJECT PREMISES.  A truck that was registered to a business was parked in front in the evening and early morning.  I saw a man who I believe is Johnston's brother, based on physical resemblance leave the SUBJECT PREMISES in the truck at around 7:10 a.m. on October 19, 2017.

31.  On October 19, 2017, I met with Fontana Police Department ("FPD").  During the interview, SSA O'Hara learned

10

**Instrumentality Protocol**

that on June 5, 2017, the FPD responded to the SUBJECT PREMISES regarding a child welfare call.  Upon arrival, FPD Officer Heidi Kouroubacalis encountered JOHNSTON.  JOHNSTON identified himself and said he lived at the SUBJECT PREMISES.

32.  On October 19, 2017, I met with United Parcel Service carrier, Stacey, who worked in the area around the SUBJECT PREMISES.  Stacey stated that she just delivered a signature confirmation to the SUBJECT PREMISES addressed to JOHNSTON.  The male who signed for the parcel was a heavier-set male, approximately 30 years of age, and fit JOHNSTON's description.

33.  On the same day, I also met with the United States Postal Service ("USPS") carrier for that area.  The USPS carrier confirmed that JOHNSTON received mail regularly at the SUBJECT PREMISES.  The USPS carrier showed SSA O'Hara an envelope from U.S. Bank addressed to "Matthew R Johnston."

## V.   TRAINING AND EXPERIENCE ON FEDERAL EMPLOYEE IMPERSONATION INVESTIGATIONS

34.  Based on my background, training, and experience, I know that Title 18, United States Code, Section 912 prohibits individuals from assuming or pretending to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value.

35.  Based on my background, training, and experience, I know that Title 18, United States Code, Section 701 prohibits any individual from manufacturing, selling, or possessing any

11

Instrumentality Protocol

badge, identification card, or other insignia, of the design prescribed by the head of any department or agency of the United States for use by any officer or employee thereof, or any colorable imitation thereof, or photographs, prints, or in any other manner makes or executes any engraving, photograph, print, or impression in the likeness of any such badge, identification card, or other insignia, or any colorable imitation thereof, except as authorized under regulations made pursuant to law.

36.  Based on my background, training, and experience, I know that Title 18, United States Code, Section 506(a)(3) prohibits anyone with fraudulent intent to, possess, sell, offer for sale, furnish, offer to furnish, give away, offer to give away, transport, offer to transport, import, or offer to import any such seal or facsimile thereof, knowing the same to have been so falsely made, forged, counterfeited, mutilated, or altered.

37.  Based on my background, training, and experience, I know that Title 18, United States Code, Section 499 prohibits any individual from falsely making, forging, counterfeiting, altering, or tampering with any naval, military, or official pass or permit, issued by or under the authority of the United States, or with intent to defraud uses or possesses any such pass or permit, or impersonates or falsely represents himself to be or not to be a person to whom such pass or permit has been duly issued, or willfully allows any other person to have or use any such pass or permit, issued for his use alone.

Instrumentality Protocol

38.    Based on my training and experience in impersonation cases, I have encountered numerous individuals who have falsely represented themselves to be federal employees, or law enforcement officers.   These individuals often use items to convince others of their legitimacy as a federal employee or law enforcement officer.   These items include: counterfeit identification documents, apparel with law enforcement markings, law enforcement tactical gear, weapons, and red and blue colored lights.   Individuals involved in impersonating federal employees often create their own fraudulent identity documents and other items purporting to be from a federal agency.   It is common practice for such individuals to use digital devices to alter existing identification documents or law enforcement materials, or to create fraudulent identification documents or law enforcement materials.   They also may be their digital devices to research the appearance of authentic identification documents or law enforcement materials.   It is common for individuals who impersonate federal employees to keep this information on their digital device for a long time.

39.    It is also common for people who impersonate federal employees or law enforcement to use various vehicles in their crimes.   Vehicles may support the legitimacy of their assumed identity because they could be purported undercover law enforcement vehicles, which may contains lights and sirens indicative of law enforcement.   Frequently people who impersonate federal employees or law enforcement use cars that

13

Instrumentality Protocol

are not registered in their own identity, they frequently use cars which are registered to businesses, are rented, or do not have proper license plates.

**VI.   TRAINING AND EXPERIENCE REGARDING ILLEGAL FIREARMS**

40.   Based on my background, training, and experience, I know that persons who possess firearms generally maintain the firearms and records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as a residence.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their cell phones, smart phones, computers, and other digital devices.  It has been my experience that individuals who purchase firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Many people do not dispose of their firearms-related records; they usually keep their records for long periods, often spanning several years, in a secure location within their residence.

41.   Correspondence between persons buying and selling firearms often occurs by e-mail or text message sent to and from smart phones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In addition, it is common for

Instrumentality Protocol

individuals who illegally own firearms to have photographs of firearms they possess on their cellular phones and other digital devices as they frequently send these photos to others to boast of their firearms possession.

42.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple telephones, particularly ones with removable memory chips, known as SIM cards.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

43.  Often, individuals who impersonate federal employees take photographs of the fraudulent identification or agency related items they have produced or other items associated with the impersonation.  They also take photographs of benefits they have received from impersonating a federal employee, such as people they have impressed and money or other valuable items, including drugs, gift cards, or vehicles.

44.  Individuals impersonating federal employees on social media often do so on multiple platforms (Facebook, Instagram, LinkedIn, etc.) and also in their electronic communications such as e-mail, text messages, What's App, and Snapchat.  Evidence of social media and electronic communication related to impersonating a federal employee would be found on digital devices.

45.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

Instrumentality Protocol

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in

16

**Instrumentality Protocol**

the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

17

**Instrumentality Protocol**

onto a hard drive, deleted, or viewed via the Internet.[3]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[3] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

**Instrumentality Protocol**

requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can

19

**Instrumentality Protocol**

record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt"

20

Instrumentality Protocol

to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.

    46.  As discussed herein, based on my training and
experience I believe that digital devices will be found during
the search.  I know from my training and experience and my
review of publicly available materials that Apple Inc.,
Motorola, HTC, and Samsung, among other companies, produce
devices that can be unlocked by the user with a numerical or an
alpha-numerical password, or, for some newer versions of the
devices, with a fingerprint placed on a fingerprint sensor.
Each company has a different name for its fingerprint sensor
feature; for example, Apple's is called "Touch ID."  Once a user
has set up the fingerprint sensor feature in the security

**Instrumentality Protocol**

settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

47. In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple's Touch ID feature, these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked; and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made. Other brands have similar restrictions. I do not know the passcodes of the devices likely to be found at the SUBJECT PREMISES.

22

**Instrumentality Protocol**

48.    For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant.  The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant.  The warrant seeks to use JOHNSTON's fingerprints and/or thumbprint on the premises described in Attachment A-2.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search.  Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

49.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

23

Instrumentality Protocol

## VIII.    <u>CONCLUSION</u>

50.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found at the SUBJECT PREMISES and person to be searched, as described in Attachments A-1 and on the person of JOHNSTON disclosed in Attachment A-2.

_____
Jeremy M. O'Hara,
Senior Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this _____ day of October, 2017.

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

**Instrumentality Protocol**